IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re PATRICIA JEPSON, ) <br> ) <br>       Debtor. ) <br> ) <br> _____ ) <br> ) <br> PATRICIA JEPSON ) <br> ) <br>       Plaintiff Appellant, ) <br> ) <br>       v. ) <br> ) <br> BANK OF NEW YORK MELLON, ) <br> ) <br>       Defendant Appellee. ) | U.S.B.C. No. 12-29466 <br> Adversary No. 12-1660 <br><br><br><br><br><br><br><br> No. 14 C 423 |

MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, District Judge:

Debtor and appellant Patricia Jepson ("Jepson") appeals from two orders entered by Bankruptcy Judge Timothy Barnes of the United States Bankruptcy Court for the Northern District of Illinois ("Bankruptcy Court") dismissing Jepson's adversary case against defendant Bank of New York Mellon ("BNYM"), formerly known as The Bank of New York, as Trustee for CWABS, Inc., Asset-backed Certificates, Series 2006-1 ("CWABS Trust"), (Adv. Dkt. No. 38)[1], and modifying the automatic stay of Jepson's general bankruptcy case in favor of BNYM (Bankr. Dkt. No. 69). For the reasons set forth below, both orders (Adv. Dkt. No. 38; Bankr. Dkt. No. 69) entered by Judge Barnes of the Bankruptcy Court are affirmed.

---

[1] In this opinion, this court will refer to documents in the docket of the adversary proceeding between Jepson and BNYM (No. 12 AP 1660) as follows: (Adv. Dkt. No. __.); and will refer to documents in the docket of Jepson's general bankruptcy proceeding (No. 12 BK 29466) as follows: (Bankr. Dkt. No. __.).

BACKGROUND

I.  Jepson's Mortgage and Bankruptcy

On December 19, 2005, Countrywide Home Loans, Inc. ("Countrywide"), doing business as America's Wholesale Lender, lent Jepson $336,000. That loan was subject to an interest only adjustable rate note executed in favor of Countrywide. (Adv. Dkt. No. 30-3.) On the same day, Countrywide executed a mortgage to secure the note on real estate owned by Jepson located at 1127 North King Arthur Court, Palatine, Illinois 60607 (the "Property"). (Adv. Dkt. No. 30-2.) Countrywide secured its interest in the note by recording the mortgage with the Cook County Recorder's Office on February 24, 2006. (*Id.*) The mortgagee of the mortgage was the Mortgage Electronic Registration Systems, Inc. ("MERS"), which acted as nominee for the lender, Countrywide. (*Id.*) Under the terms of the note, Jepson agreed to pay 7.85% in interest at a yearly rate, and to make monthly payments on the first day of every month in the amount of $2,198. (Adv. Dkt. No. 30-3.) Beginning on January 1, 2009, Jepson agreed to pay interest at a floating rate equal to 6.85% above the six-month London Interbank Offered Rate ("LIBOR"). (*Id.*)

On January 1, 2006, Countrywide executed a Pooling and Servicing Agreement ("PSA"), in which it transferred Jepson's mortgage to the CWABS Trust. (Dkt. No. 8 "(PSA").) [2] Countrywide transferred Jepson's mortgage by endorsing the note in blank and negotiating it "by delivery" to BNYM, the trustee for the CWABS Trust. [3] On August 14, 2008, MERS, as

---

[2]  The parties stipulated that the PSA be part of the record on appeal. The copy of the PSA the parties filed, however, is poorly scanned and barely legible. (*See* Dkt. No. 8.) As part of the securitization process, PSAs are filed publicly with the Securities and Exchange Commission. The PSA pertaining to the CWABS Trust is available at:
http://www.sec.gov/Archives/edgar/data/1351993/000090514806001502/efc6-0592_ex41.txt

[3]  At the December 10, 2013 hearing before the Bankruptcy Court, BNYM possessed and tendered to the Bankruptcy Court the original note endorsed in blank. (Dkt. No. 9 at 10.)

Countrywide's nominee, assigned the rights associated with Jepson's mortgage to BNYM, as Trustee for the CWABS Trust. (Adv. Dkt. No. 30-4.) The Assignment of Mortgage ("AOM") was signed by Marti Noriega and Denise Bailey, Vice President and Assistant Secretary of MERS, respectively. (*Id.*) According to the terms of the AOM, BNYM acquired all of MERS's interests in and under Jepson's mortgage. (*Id.*)

In 2008, Jepson defaulted on her monthly obligations to pay principal, interest, and taxes.[4] According to BNYM, as of July 30, 2012, the entire principle of $336,000 plus an additional $167,978.05 in accrued interest remained due. (Bankr. Dkt. No. 16.) On August 12, 2008, after Jepson defaulted, BNYM filed a complaint in the Circuit Court of Cook County, Illinois to foreclose on the mortgage against Jepson. (Adv. Dkt. No. 1 ("Adv. Compl.") ¶ 24.)

On July 25, 2012, Jepson filed a Chapter 7 Voluntary Petition ("Petition") in the Bankruptcy Court. (Bankr. Dkt. No. 1.) Jepson's Petition triggered an automatic stay against the enforcement of any security interest, including BNYM's ongoing foreclosure action in Illinois state court. 11 U.S.C. § 362. On September 19, 2012, BNYM filed a motion requesting that the Bankruptcy Court modify the automatic stay and permit BNYM to resume its foreclosure action. (Bankr. Dkt. No. 16.) On October 30, 2012, in response to BNYM's motion, Jepson filed an adversary complaint ("Adversary Complaint") against BNYM seeking a declaration that BNYM has no interest in Jepson's mortgage (Count I) and seeking an order enjoining BNYM from foreclosing on the Property. Jepson alleged BNYM has no interest in Jepson's mortgage and should be classified as an "unlicensed collection agency" under Illinois law (Count II). (Adv. Compl.) Both counts of Jepson's Adversary Complaint rely on her allegation that defects in the

---

[4] Neither Jepson's Adversary Complaint nor BNYM's filings state the precise date of Jepson's default.

securitization process prevented BNYM, as trustee for the CWABS Trust, from acquiring ownership of Jepson's mortgage.

II. Securitization of Jepson's Mortgage

As discussed above, Jepson's mortgage was originated by Countrywide, doing business as America's Wholesale Lender. (Bankr. Dkt. No. 16-3, 16-4.) David A. Spector ("Spector"), a managing director of Countrywide, endorsed Jepson's note in blank, and negotiated Jepson's note by delivery to the CWABS Trust,[5] which is a residential mortgage-backed securities ("RMBS") trust. (Bankr. Dkt. No. 16-3 at 6.)

RMBS are securities entitling the holder to income payments from pools of residential mortgage loans that are held by a trust. The offering process typically starts with a "sponsor" or a "seller," which originates or acquires mortgage loans to be included in the offering. The sponsor transfers a portfolio of mortgage loans to the trust through an intermediary known as a "depositor." The depositor purchases loans from the sponsor and places them in the trust in exchange for certificates issued by the trust. The certificates are backed by the underlying mortgages. The depositor then sells the certificates to an underwriter, or a group of underwriters, which are responsible for selling the certificates to investors. *See Federal Housing Finance Agency* v. *UBS Americas, Inc.*, 858 F. Supp. 2d 306, 311-12 (S.D.N.Y. 2012) (describing the RMBS securitization process).

An RMBS trust is formed and governed by a contract called a Pooling and Servicing Agreement ("PSA"). The parties to a PSA typically include (1) a depositor, which conveys the loans to the RMBS trustee, (2) an RMBS trustee, which owns and holds mortgage loans in trust for

---

[5] Spector endorsed Jepson's note with a stamp. Neither the stamped endorsement nor BNYM's filings state the date of the endorsement.

4

investors who buy certificates, and (3) a servicer, which handles the administrative duties associated with the individual mortgage loans, such as monthly payment collection. *See Tran* v. *Bank of New York*, 2014 WL 1225575, *1 (S.D.N.Y. Mar. 24, 2014) (citations omitted) (describing the role of the PSA). The PSA provides for delivery of trust assets, typically promissory notes and mortgages, to the trustee in a particular manner on or before a specified closing date. *Id.*

The CWABS Trust was created under New York law for the purpose of pooling adjustable and fixed rate subprime mortgage loans. (PSA § 2.03). Countrywide Asset-Backed Securities, Inc. was the depositor, Countrywide Home Loans Servicing LP was the servicer,[6] and BNYM was (and remains) the trustee. Countrywide Home Loans, Inc., which originated Jepson's mortgage loan, was also a party to the PSA as a seller of mortgage loans. Jepson was not a party to the PSA.

Section 2.01 of the PSA, which governs the conveyance of mortgage loans from the sellers to the depositor and from the depositor to the CWABS Trust, states that for every pooled mortgage loan,

> the original Mortgage Note, endorsed by manual or facsimile signature in blank in the following form: "Pay to the order of _____ without recourse", *with all intervening endorsements that show a complete chain of endorsement* from the originator to the Person endorsing the Mortgage Note (each such endorsement being sufficient to transfer all right, title and interest of the party so endorsing, as noteholder or assignee thereof, in and to that Mortgage Note) . . . .

(PSA § 2.01(g)(i) (emphasis added).) Section 2.02(a) provides that the Trustee will deliver a certification form by the closing date (February 10, 2006), certifying its acceptance of "all documents required to be delivered to the Trustee" with respect to the initial mortgage loans, to the

---

[6] According to Jepson's Adversary Complaint, the servicing rights were sold first to Litton Loan Servicing and then to Ocwen Servicing. (Adv. Compl. ¶¶ 14, 28.)

5

Depositor, the Master Servicer, and the three sellers of mortgage loans, including Countrywide. (PSA § 2.02(a).)

Here, Countrywide endorsed Jepson's note in blank and negotiated it by delivery to the BNYM, as trustee for the CWABS Trust. (Adv. Dkt. No. 30-3.) There are no intervening endorsements showing a complete chain of endorsement as required by Section 2.01 of the PSA. MERS did not assign Jepson's mortgage to BNYM until August 14, 2008, two days after BNYM filed its foreclosure action and more than two years after the February 10, 2006 closing date stated in the PSA.

Jepson's Adversary Complaint alleges that Countrywide's defective and after-the-deadline transfer of Jepson's mortgage violated the terms of the PSA and rendered the conveyance of her mortgage to BNYM void. (Adv. Compl. 50-55.) As a result, Jepson asserts that BNYM never acquired ownership of her mortgage (Count I) (Adv. Compl. ¶¶ 1-55), and by attempting to acquire and enforce her mortgage now, after she has defaulted, BNYM is operating as an unlicensed collection agency in violation of Illinois law (Count II) (Adv. Compl. ¶¶ 56-67).

BNYM moved to dismiss Jepson's Adversary Complaint under Fed. R. Civ. P. 12(b)(1) on the basis that Jepson lacked standing to assert claims based on alleged breaches of the PSA. (Adv. Dkt. Nos. 29, 30.) BNYM also moved to dismiss Jepson's Adversary Complaint under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. On December 10, 2013, the Bankruptcy Court granted BNYM's motion to dismiss Jepson's Adversary Complaint for lack of standing, (Adv. Dkt. No. 38), and having done so granted BNYM's motion for relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(2) (Bankr. Dkt. No. 69).[7] The Bankruptcy Court concluded that Jepson, under

---

[7] Section 362(d)(2) authorizes the Bankruptcy Court to lift the automatic stay when the debtor no longer has an equity interest in a property.

New York and federal law, did not have standing to maintain claims based on non-compliance with the PSA. (Dkt. No. 9 at 10-11.)

Jepson now appeals the Bankruptcy Court's rulings, arguing that the Bankruptcy Court erred in dismissing her Adversary Complaint for lack of standing and thus should not have lifted the stay enjoining BNYM from pursuing non-bankruptcy remedies with respect to Jepson's Property.

## LEGAL STANDARD

"A bankruptcy court's findings of fact are reviewed for clear error, and its conclusions of law are reviewed *de novo*." *In re Midway Airlines, Inc.*, 383 F.3d 663, 668 (7th Cir. 2004) (citing *In re Smith*, 286 F.3d 461, 464-65 (7th Cir. 2002)). The Bankruptcy Court's grant of dismissal and modification of the automatic stay is a conclusion of law and is therefore reviewed *de novo*. Fed. R. Civ. P. 12(b)(1) permits a defendant to move for dismissal of a claim where there is a lack of subject-matter jurisdiction. A motion under Rule 12(b)(1) can also seek to dismiss a claim for lack of standing. *See Retired Chicago Police Ass'n* v. *City of Chicago*, 76 F.3d 856, 862 (7th Cir.1996). In ruling on a motion to dismiss for want of standing, "the district court must accept as true all material allegations of the complaint and must draw all reasonable inferences therefrom in favor of the plaintiff." *Retired Chicago Police Ass'n.*, 76 F.3d at 862 (citing *Warth* v. *Seldin*, 422 U.S. 490, 501). The plaintiff bears the burden of establishing the required elements of standing. *Id.* (citing *Lujan* v. *Defenders of Wildlife*, 504 U.S. 555, 561 (1992)).

The question of standing is jurisdictional in nature, and addresses "whether the litigant is entitled to have the court decide the merits of the dispute or particular issues." *Apex Digital, Inc.* v. *Sears, Roebuck & Co.*, 572 F.3d 440, 444 (7th Cir.2009) (quoting *Warth*, 422 U.S. at 498 (internal quotations omitted)). There are both constitutional and prudential limitations on the jurisdiction of

7

federal courts. *Warth*, 422 U.S. at 498. Under Article III of the U.S. Constitution, federal court's jurisdiction is limited to claims presenting a case or controversy between the plaintiff and the defendant. *Id.* In order to establish constitutional standing, the party invoking federal jurisdiction must demonstrate "a personal injury fairly traceable to the defendant's allegedly unlawful conduct and likely to be redressed by the requested relief." *Allen* v. *Wright*, 468 U.S. 737, 751 (1984). Even if constitutional standing is established, however, there are also prudential limitations to a federal court's exercise of jurisdiction. *FMC Corp.* v. *Boesky*, 852 F.2d 981, 988 (7th Cir. 1988). Prudential standing requires a plaintiff to assert his own legal rights and interests, and not rest his claims on the legal rights or interests of third parties. *Warth*, 422 U.S. at 499.

## ANALYSIS

Both counts of Jepson's Adversary Complaint, as well as Jepson's issues on appeal, are predicated upon alleged breaches of the PSA. The Bankruptcy Court found that Jepson lacked standing to assert claims based on violations of the PSA and dismissed Jepson's Adversary Complaint without determining whether the transfer of Jepson's mortgage was actually defective. This court agrees. Because Jepson does not have standing to assert claims based on non-compliance with the PSA, which is the theory underlying both counts of her Adversary Complaint, the Bankruptcy Court correctly granted BNYM's motion to dismiss.

As a threshold matter, Jepson does not claim to have been a party to the PSA, and the PSA does not include any provision indicative of party status for borrowers or mortgagors. The weight of the case law, in this district and throughout the country, holds that a non-party to a PSA lacks standing to assert non-compliance as a claim or defense unless the non-party is an intended third-party beneficiary of the PSA. *See HSBC Bank USA, NA* v. *Hardman*, No. 12 C 481, 2013 WL 515432, *6 (N.D. Ill. Feb. 12, 2013) (Chang, J.) (noting "courts have generally held that third

8

parties do not have standing to enforce the terms of a PSA"); *Long* v. *One West Bank, FSB*, No. 11 C 703, 2011 WL 3796887, *4 (N.D. Ill. 2011) (Der-Yeghiayan, J.) ("[T]o the extent that Plaintiffs seek to base claims on violations of the PSA, Plaintiffs were not parties to the PSA and lack any standing to assert such claims."); *see also Tran*, 2014 WL 1225575, at *4 (citing *Rajamin* v. *Deutsche Bank Nat. Trust. Co.*, 2013 WL 1285160, *3 (S.D.N.Y. Mar. 28, 2013)) (same); *In re Walker*, 466 B.R. 271, 282 (Bankr. E.D. Pa. 2012) (same); *Livonia Property Holdings, LLC.* v. *12840-12976 Farmington Rd. Holdings, LLC*, 717 F. Supp. 2d 724, 736-37 (E.D. Mich. 2010) ("[F]or over a century, state and federal courts around the country have [held] that a litigant who is not a party to an assignment lacks standing to challenge that assignment."), *aff'd*, 399 F. App'x 97 (6th Cir. 2010).

New York law, which the parties agree governs the interpretation of the PSA, is no different. New York courts consistently hold that non-parties, who are not beneficiaries of a trust, lack standing to enforce the trust's terms or to challenge actions of the trustee. *Tran*, 2014 WL 1225575, at *3 (citing *In re Estate of McManus*, 390 N.E.2d 773, 774 (N.Y. 1979); *Cashman* v. *Petrie*, 201 N.E.2d 24, 26 (N.Y. 1964); *Naversen* v. *Gaillard*, 831 N.Y.S.2d 258, 259 (N.Y. App. Div. 2007)).

Despite the overwhelming case law, Jepson argues that the breaches of the PSA, specifically, the absence of a note with all intervening endorsements and Countrywide's assignment of her mortgage to BNYM after the closing date, rendered the transfer void under Section 7-2.4 of the New York Estates, Powers, and Trusts Law ("EPTL"). (Dkt. No. 10 ("Jepson Br.") at 4-8, 10-12.) Section 7-2.4 provides that "if the trust is expressed in the instrument creating the estate of the trustee, every sale, conveyance, or other act of the trustee in contravention of the

trust, except as authorized by this article and by any other provision of the law, is void." EPTL § 7-2.4.

Jepson's forty-seven page brief declines to state why she has standing, as a non-party, to challenge the transfer as void. The validity of the conveyance does not affect whether Jepson owes a debt, merely to whom Jepson is obligated to pay. The answer lies in Corpus Juris Secundum (Assignments) (2004), which states:

> A debtor may, generally, assert against an assignee all equities or defenses existing against the assignor prior to notice of the assignment, any matters rendering the assignment absolutely invalid or ineffective, and the lack of the plaintiff's title or right to sue; but, if the assignment is effective to pass legal title, the debtor cannot interpose defects or objections which merely render the assignment voidable at the election of the assignor or those standing in his or her shoes.

6A C.J.S. *Assignments* § 132. *See also Bank of Am. Nat'l Ass'n v. Bassman FBT, LLC,* 981 N.E.2d 1, 8 (Ill. App. Ct. 2d Dist. 2012) (discussing standing to challenge a void assignment). Thus, Jepson's standing turns on whether non-compliance with the PSA rendered the assignment of her mortgage *void* or merely *voidable*. A void contract is "invalid or unlawful from its inception," while a voidable contract "is one where one or more of the parties have the power, by the manifestation of an election to do so, to avoid the legal relations created by the contract." 17A C.J.S. Contracts § 169.

Although the New York Court of Appeals has not ruled directly on the issue, New York intermediate appellate courts have repeatedly held that an act in violation of a trust agreement, like a PSA, is voidable, not void. *See In re Levy*, 893 N.Y.S.2d 142, 144 (N.Y. App. Div. 2010); *Mooney* v. *Madden*, 597 N.Y.S.2d 775, 776 (N.Y. App. Div. 1993); *Leasing Serv. Corp.* v. *Vita Italian Rest., Inc.*, 566 N.Y.S.2d 796, 797 (N.Y. App. Div. 1991).

Jepson cites two cases in support of her argument that conveyances in violation of the terms of a PSA are void, not voidable, under EPTL § 7-2.4. The first, *Wells Fargo Bank, N.A.*, v.

*Erobobo*, 2013 WL 1831799 (N.Y. Sup. Ct. Apr. 29, 2013), is an unpublished New York trial court decision; it is not, as Jepson states in her brief, "the controlling decision of the highest state court in New York." (Jepson Br. at 8.) Since it issued, *Erobobo's* reasoning and holding have been sharply criticized by a number of courts. *See, e.g.*, *Butler* v. *Deutsche Bank Trust Co. Americas*, -- F. 3d --, 2014 WL 1328296, *7 n.8 (1st Cir. Apr. 4, 2014) (noting "the vast majority of courts to consider the issue have rejected *Erobobo's* reasoning"); *Tran*, 2014 WL 1225575, *4-5; *Felder* v. *Countrywide Home Loans*, 2013 WL 6805843, *19 n.170 (S.D. Tex. Dec. 20, 2013); *Koufos* v. *U.S. Bank, N.A.*, 939 F. Supp. 2d 40, 57 n.2 (D. Mass. 2013) (collecting cases rejecting *Erobobo*); *Orellana* v. *Deutsche Bank Nat. Trust Co.*, 2013 WL 5348596, *5 n.13 (D. Mass. Aug. 30, 2013); *In re Sandri*, 501 B.R. 369, 376 (Bankr. N.D. Cal. 2013). The second case Jepson cites is an opinion by the Bankruptcy Court for the Southern District of Texas that follows *Erobobo* and is inconsistent with a decision that issued days earlier from a district court in the same district. *Compare In re Saldivar,* 2013 WL 2452699, at *4 (Bankr. S.D. Tex. June 5, 2013) (late transfer was void), *with Sigaran* v. *U.S. Bank Nat. Ass'n,* 2013 WL 2368336 at *3 (S.D.Tex. May 29, 2013) (under New York law, "assignments made after the Trust's closing date are voidable, rather than void").

The vast majority of federal courts hold that under New York law, an assignment of a mortgage into a trust in violation of the terms of the PSA is voidable, not void. *See, e.g.*, *Tran*, 2014 WL 1225575, *5 (holding "after-the-deadline transactions would merely be voidable at the election of one or more of the parties—not void"); *Koufos,* 939 F. Supp. 2d at 49 n.5, 56 n.2 ("non-PSA-compliant" transaction is typically "voidable," rather than "void" under New York law); *Halacy* v. *Wells Fargo Bank, N.A.*, 2013 WL 6152351 (D. Mass. Nov. 21, 2013) (same); *Sigaran,* 2013 WL 2368336, at *3 (same); *Svoboda* v. *Bank of Am., N.A.,* 2013 WL 4017904, *6

11

(W.D. Tex. Aug. 6, 2013) (same); *Calderon* v. *Bank of Am., N.A.*, 941 F. Supp. 2d 753, 766 (W.D. Tex. 2013) (collecting New York cases and stating that "New York case law ... makes clear that section 7–2.4 is not applied literally in New York" and holding that "even if it is true that the Note was transferred to the Trust in violation of the PSA, that transaction ... is merely voidable"); *see also Bassman,* 981 N.E.2d at 9 (collecting cases and noting that "numerous cases, including several that specifically reference [EPTL § 7–2.4], indicate that under various circumstances a trustee's *ultra vires* acts are not void").

This court finds the reasoning of the vast majority of federal courts persuasive. Even assuming the transfer of Jepson's mortgage into the CWABS Trust violated the terms of the PSA, such violation would merely render the transfer voidable at the election of one or more of the parties to the PSA, not void. Consequently, Jepson, a non-party debtor, has no standing to assert claims predicated on alleged breaches of the PSA.

Because both counts of Jepson's Adversary Complaint rely on alleged breaches of the PSA, which Jepson does not have standing to assert, both counts were properly dismissed pursuant to Rule 12(b)(1). Furthermore, because BNYM possessed and presented the original promissory note, the Bankruptcy Court properly modified the restraining provisions of 11 U.S.C. § 362 so as not to restrain BNYM from pursuing non-bankruptcy remedies with respect to Jepson's Property.

## CONCLUSION

The decisions of the Bankruptcy Court dismissing Jepson's adversary case against defendant Bank of New York Mellon, as Trustee for CWABS, Inc., Asset-backed Certificates, Series 2006-1, (Adv. Dkt. No. 38), and modifying the automatic stay of Jepson's general bankruptcy case in favor of the Bank of New York Mellon, as Trustee for CWABS, Inc., Asset-backed Certificates, Series 2006-1 (Bankr. Dkt. No. 69) are affirmed. Civil case terminated.

ENTER:

_____
JAMES F. HOLDERMAN
District Judge, United States District Court

Date: May 9, 2014